_____ FILED ____ ENTERED
_____ LOGGED _____ RECEIVED

11:07 am, May 14 2021
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF**<br><br>**A SAMSUNG CELLULAR PHONE, IMEI: 359186102966938 AND AN APPLE IPHONE, IMEI: 356470101341886** | **Case No.**   1:21-mj-1161 TMD<br><br>_____ |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Michael Pecukaitis, Postal Inspector, United States Postal Inspection Service ("USPIS"), being first duly sworn, hereby depose and state the following:

### INTRODUCTION

1.     The USPIS, the United States Postal Service Office of the Inspector General ("USPS-OIG"), and the Drug Enforcement Administration ("DEA") have been conducting a criminal investigation of the Maurice Eugene Stokes Sr. Drug Trafficking Organization ("STOKES SR. DTO") and its co-conspirators, including Maurio Dores Barham ("BARHAM") and Charles Stevens Pate ("PATE"), for violations of 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute Marijuana, Schedule I), 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance), and 21 U.S.C. § 843(b) (Transportation of Controlled Dangerous Substances via the United States Mail) ("collectively the Target Offense").

2.     I submit this affidavit in support of an application for a warrant authorizing the search of the following electronic devices:

| TARGET DEVICES | DESCRIPTION & USPIS PEAP NUMBER |
|---|---|
| TARGET DEVICE 1 | Samsung Cellular Phone, Model No. SM-N975U, IMEI: 359186102966938, (USPIS PEAP # IS0001523529) |
| TARGET DEVICE 2 | Apple iPhone with IMEI: 356470101341886, (USPIS PEAP # IS0001523534) |

3.      The TARGET DEVICES are currently in the custody of the USPIS within the District of Maryland.  The TARGET DEVICES remain in the same, or substantially similar condition, as when they were first seized.

4.      Based on my knowledge, training, and experience, and the facts set forth in this affidavit, there is probable cause to believe that BARHAM, PATE, and others have committed violations of 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute Marijuana, Schedule I), 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance), and 21 U.S.C. § 843(b) (Transportation of Controlled Dangerous Substances via the United States Mail) ("collectively the Target Offenses").  There is probable cause to believe that a search of the TARGET DEVICES will reveal evidence of these offenses.

5.      The search warrant would authorize the forensic examination of the TARGET DEVICES for the purpose of identifying electronically stored data described in Attachment B— and using the protocols described in Attachment B— by members of the USPIS or their authorized representatives, including but not limited to, other law enforcement agents assisting in the investigation.

6.      Because I have submitted this affidavit for the limited purpose of establishing probable cause for the issuance of a search warrant, I have not included every detail or every aspect of the investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause.  I have not, however, excluded any information known to me that would defeat a

determination of probable cause.  The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals.

## AFFIANT BACKGROUND

7.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

8.      I have been a postal inspector since February 2016 and have completed 12 weeks of basic investigative training, which covered various aspects of federal law enforcement, including the investigation of narcotics-related offenses.  Prior to becoming a postal inspector, I was a special agent for the United States Capitol Police, in Washington, DC, for almost 12 years.

9.      During my employment with law enforcement, I have investigated and assisted in the investigation of numerous narcotics violations, including those that have led to the arrests of narcotics dealers.  In the course of conducting these investigations, I have been involved in the use of the following investigative techniques:  conducting physical surveillance; conducting short-term undercover operations; arranging consensual monitoring and recording of telephonic communications; analyzing telephone pen register and caller identification data; and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband. I have also received training and gained experience with interview techniques, arrest procedures, and search warrant applications.

10.      Based upon my training, experience, and participation in other investigations involving controlled dangerous substance, I am familiar with the actions, traits, habits, and

terminology used by individuals who violate drug laws.  Based upon my training and experience,

I have learned the following:

        a.      Drug trafficking is an ongoing and recurring criminal activity.  As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illegal commercial activity that is characterized by regular, repeated criminal activity.

        b.      Cellular telephones are an indispensable tool of the narcotics trafficking trade.  Narcotic traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and narcotic traffickers.  In addition, narcotic traffickers will often change their cellphones following the arrest of a member of their Drug Trafficking Organization ("DTO"), or at random in order to frustrate law enforcement efforts.

        c.      Drug traffickers keep and maintain records of their various activities.  Such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms.  Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators.  These items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them;

        d.      Drug traffickers use cellular telephones, pagers, and other electronic communication devices to facilitate illegal drug transactions.  The electronically stored information on these devices is of evidentiary in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information stored on these devices;

        e.      Drug traffickers use computers or other electronic storage media, including smart phones, to store the records, documents, or items listed in paragraphs c and d, above.

        11.      Based on my knowledge, training, and experience, I know that electronic devices

such as cellular phones can store information for long periods of time.  In some cases, even upon

deletion of stored information, forensic software can be used to recover deleted files.  Similarly,

things that have been viewed via the internet on a cellular telephone can typically be stored for

some period of time on the device.

## PROBABLE CAUSE:  TARGET DEVICE 1

### A.  Summary of Investigation

12.     Since December 2018, the USPIS, USPS OIG, and DEA have been conducting a criminal investigation into the STOKES SR. DTO that has been importing kilograms of marijuana from the metropolitan areas of Sacramento and Los Angeles, CA, to the metropolitan areas of Baltimore, MD, and Richmond, VA, including 1343 Pritchard Terrace, North Chesterfield, VA 23235 ("1343 Pritchard Terrace").  Investigators identified 1343 Pritchard Terrace as the home address of BARHAM.

13.     Investigators have identified at least ten (10) suspicious parcels sent from the metropolitan area of Sacramento, CA to 1343 Pritchard Terrace since June 2020.  Investigators have also identified at least two (2) suspicious parcel sent from Baltimore, MD to 1343 Pritchard Terrace since January 2021.  A review of CCTV footage at USPS facilities in the metropolitan area of Sacramento, CA captured Vito Antone Brown ("BROWN") sending two of the parcels on June 20, 2020 and again sending two of the parcels on October 8, 2020 to 1343 Pritchard Terrace. Due to similarities of these parcels to those seized during the investigation, investigators suspect each of the identified suspicious parcels contained drugs.  BROWN is known to be a member of the STOKES SR. DTO.

14.     Since March 2020, investigators have also identified at least 20 parcels sent from the metropolitan area of Richmond, VA to 1202 Rosegate Court, Rosedale, MD 21237, with the most recent parcel delivered on March 5, 2021.  Of the available shipping labels, each have listed "Maurio Barham" or "Maurio T. Davis" at 1343 Pritchard Terrace, North Chesterfield, VA 23235

as the sender and "Maurice Stokes" as the recipient. Investigators suspect each of the identified parcels contained proceeds from the sale of drugs.

**B. Seizure**

15.     On January 20, 2021 at approximately 3:04 p.m., I established surveillance outside of the Carroll Station Post Office in Baltimore, MD and later witnessed STOKES SR enter the facility carrying two parcels. Records showed that he mailed to USPS Priority Mail parcels – paid for in cash— with "Maurice Stokes, 1202 Rosegate Ct., Baltimore, MD 21237" as the sender and "Maurio Barham, 1343 Pritchard Terrace, North Chesterfield, VA 23235" as the recipient. I took custody of both parcels and transported them to the USPIS Linthicum Heights Domicile, where both parcels were secured.

        a.     On January 29, 2021, the Honorable Thomas M. DiGirolamo, U.S. Magistrate Judge for the District of Maryland authorized a federal search and seizure warrant for both parcels. See Case No. 20-mj-226 TMD. Investigators recovered 906 grams (+/- 10 grams) and 939 grams (+/- 10 grams) of marijuana from the respective packages, as confirmed by NMS Labs.

        b.     On February 23, 2021, the USPIS FLS issued a Forensic Laboratory Examination Report regarding fingerprints identified on the USPS Priority Mail parcels. Identified on one package was one fingerprint belonging to STOKES SR. within the inner flap. On the second parcel, two fingerprints belonging to STOKES SR. were identified on the non-adhesive side of Priority Mail tape on the Priority Mail Medium Flat Rate Box, five fingerprints belonging to STOKES SR. were identified on the clear side of a black heat sealed type bag which had been used to conceal the suspected marijuana, and one fingerprint belonging to STOKES SR. was

identified on the adhesive side of Priority Mail tape removed from the Priority Mail Medium Flat Rate Box.

**C. Surveillance**

16.     On February 4, 2021, utilizing a surveillance camera, monitoring the 100 block of South Morley Street, investigators were able to observe a white SUV park in the area of 119 South Morley Street, Baltimore, MD 21229 ("119 South Morley Street").  From this vehicle, two males exited, one immediately identifiable as STOKES SR.  Both males then approached the area of 119 South Morley Street, a residence known to be utilized by STOKES SR.

a.      At the same time, investigators conducted surveillance in the area of 1202 Rosegate Court, Rosedale, MD 21237 ("1202 Rosegate Court"), a residence known to be utilized by STOKES SR.  At approximately 9:42 a.m., a white 2020 Nissan Pathfinder bearing Florida registration IYTH19 parked in front of 1202 Rosegate Court.    STOKES SR. exited the driver's seat of the Nissan and a black male matching the physical description of BARHAM exited the front passenger seat of the Nissan.  STOKES SR. and BARHAM walked from the Nissan into 1202 Rosegate Court.  At approximately 9:45 a.m., BARHAM departed in the Nissan traveling southbound on Old Philadelphia Road.

b.      At approximately 12:32 p.m., investigators established surveillance at Avis located at 8231 Midlothian Turnpike, Richmond, VA 23235, due to information being received that the Nissan was due back on February 4, 2021.  At approximately 1:04 p.m., investigators observed the Nissan bearing Florida registration IYTH19 enter the parking lot at Avis.

c.      Based on the recent seizures of two parcels destined for BARHAM's residence on January 29, 2021 and the BARHAM's actions on February 4, 2021, investigators believe that BARHAM rented a vehicle to provide himself a level of anonymity as he drove to and

from Maryland to meet with STOKES SR. to obtain drugs from STOKES SR.'s stash house located at 119 South Morley Street. Investigators believe the bag BARHAM was observed carrying away from 119 South Morley Street likely contained drugs.

### D. Recent Parcels

17.  On February 25, 2021, I identified two USPS Priority Mail parcels sent from the North Highlands Main Post Office in North Highlands, CA on February 24, 2021. Each of the parcels was addressed to "Maurio Barham, 1343 Pritchard Terrace, North Chesterfield, VA 23235." Both of these parcels were delivered to 1343 Pritchard Terrace on February 27, 2021. On February 26, 2021, I identified two USPS Priority Mail parcels sent from the Elk Grove Main Post Office in Elk Grove, CA. Each of the parcels was addressed to "Maurio Barham, 1343 Pritchard Terrace, North Chesterfield, VA 23235." Both of these parcels were delivered to 1343 Pritchard Terrace on March 2, 2021.

18.  On March 4, 2021, I identified a Priority Mail Express parcel at the USPS Incoming Mail Facility in Linthicum Heights, MD. The shipping label on this parcel listed "Maurio Barham, 1343 Pritchard Terr., Nth Chesterfield, VA 23235" as the sender and "Maurice Stokes, 1202 Rosegate Ct., Rosedale, MD 21237" as the recipient. I handled the parcel and was able to identify two separate masses within the package that each measured approximately 2.5" by 6" by .5". Based on the size of those masses, which appears to be consistent with the size of stacks of currency, I believe the parcel contained payment or proceeds from the sale of drugs received on February 27, 2021 and March 2, 2021.

**E. Residential Search Warrant**

19.   On March 22, 2021, the Honorable Elizabeth W. Haines, U.S. Magistrate Judge for the Eastern District of Virginia authorized a federal search and seizure warrant for the premises located at 1343 Pritchard Terrace, North Chesterfield, VA 23235.  See Case No. 3:21-sw-031.

20.   On April 2, 2021, investigators from the USPIS and DEA executed the search and seizure warrant at 1343 Pritchard Terrace, North Chesterfield, VA 23235.  Investigators located and seized approximately 3,975 grams of suspected marijuana concealed in seven vacuum sealed bags, which were located behind a freezer in the garage.  Also from in the garage, investigators seized approximately 630 grams of suspected marijuana concealed in one vacuum sealed bag and one zip-top bag, which were located in a plastic container on a work bench shelf in the garage.  Investigators also seized two digital scales, which each powered on and appeared to be in good working condition from the garage.  In the master bedroom, investigators seized approximately 15 grams of suspected marijuana and TARGET DEVICE 1.  BARHAM advised that TARGET DEVICE 1 was his cellular phone.

## PROBABLE CAUSE:  TARGET DEVICE B

**F. Parcels that had been sent to 2020 Braddish Avenue**

21.   Investigators have identified forty (40) suspicious parcels sent from California to 2020 Braddish Avenue believed to be attributed to the STOKES SR. DTO.  Each of the parcels had been sent via USPS Priority Mail in a medium flat rate box and had weighed approximately three pounds.  Of the available shipping labels, each had been addressed to "Ronnie McManus" at 2020 Braddish Avenue.  Despite law enforcement efforts, investigators have been unable to identify a Ronnie McManus residing in Maryland.  Investigators identified PATE as a resident of 2020 Braddish Avenue and the likely recipient of the suspicious parcels.

22.     BROWN has been observed on multiple occasions via CCTV sending parcels from post offices in California to 2020 Braddish Avenue.  On September 4, 2019, BROWN sent two parcels from a post office in Los Angeles, CA to 2020 Braddish Avenue, and again on September 17, 2019.  On December 11, 2019, BROWN also sent a total of two parcels from two different post offices in the metropolitan area of Sacramento, CA to 2020 Braddish Avenue.  It should be noted during the investigation, investigators have seized three parcels sent by BROWN, which have each been found to contain marijuana.

23.     A review of flight records for STOKES SR. has shown that STOKES SR. has been in Los Angeles, CA or Sacramento, CA when 39 of the 40 identified parcels were sent to 2020 Braddish Avenue.  A review of flight records for BROWN has shown that BROWN has been in Los Angeles, CA or Sacramento, CA with STOKES SR. when 31 of the 40 identified parcels were sent to 2020 Braddish Avenue.

**G. Seizure**

24.     On or about February 26, 2021, I identified two suspicious parcels that had been sent from the post office in Elk Grove, CA to 2020 Braddish Avenue on February 25, 2021.

25.     Although one had been delivered, on March 8, 2021, I located and intercepted the second suspicious parcel.  On March 18, 2021, the Honorable J. Mark Coulson, U.S. Magistrate Judge for the District of Maryland authorized a federal search and seizure warrant for the parcel and nine others[1] believed to be attributed to the STOKES SR. DTO.  See Case No. 21-mj-00763 JMC.  On March 24, 2021, investigators executed the federal search and seizure warrant and recovered approximately 1,065 grams of a green, leafy, plantlike substance that field tested presumptive positive as marijuana from the parcel.

---

[1] Investigators executed the search warrant on each of the nine suspicious parcels and recovered between approximately 1060 grams and approximately 1065 grams of suspected marijuana from each of the suspicious parcels.

26.     A review of the CCTV footage from the post office located in Elk Grove, CA on February 25, 2021 during the time the two suspicious parcels were sent revealed that a black female had sent both packages.  Investigators believe the physical description of the sender of both parcels matched that of Nicole Cora Garner ("GARNER"), who is believed to be a co-conspirator of STOKES SR.  Moreover, a review of flight records showed GARNER and STOKES SR. were both in Sacramento, CA when both of the suspicious parcels were sent.

**H.  Residential Search Warrant**

27.     On April 2, 2021, the Honorable Thomas M. DiGirolamo, U.S. Magistrate Judge for the District of Maryland authorized a federal search and seizure warrant for the premises located at 2020 Braddish Avenue, Baltimore, MD 21216.  See Case No. 21-mj-991 TMD.

28.     On April 7, 2021, investigators from the USPIS and DEA executed the search and seizure warrant at 2020 Braddish Avenue, Baltimore, MD 21216.  Investigators located and seized approximately 13.2 grams of suspected marijuana and a digital scale with suspected marijuana residue.  The digital scale powered on and appeared to be in good working condition.  The suspected marijuana and digital scale were located in the same black shopping bag within a hutch drawer in the dining room.  TARGET DEVICE 2 was located on the nightstand table on the left side of the master bedroom.  PATE advised the TARGET DEVICE 2 was his and provided the passcode for it.  However, I did not request written consent for permission to search TARGET DEVICE 2.

29.     During a post Miranda interview, PATE advised the marijuana in the hutch was his and he also had a firearm, which was in his Ford Edge.  I obtained written consent from PATE to search his 2015 Ford Edge bearing Maryland registration 5DL1518 on IS Form 8193 – Consent to Search.  Investigators searched PATE's Ford Edge and recovered a Sturm, Ruger, & Co. Inc.

Security Six, .357 Magnum Firearm bearing serial number 15503939, which was loaded with five rounds of ammunition.

30.     PATE acknowledge receiving ten (10) parcels at 2020 Braddish Avenue prior to March 2020, which he would then take to a location in the Sandtown neighborhood of Baltimore, MD at the direction of a female friend.  PATE did not know the address of the location or the name of the female.  PATE said he would get paid $100 for each box that he delivered to the location.

## BACKGROUND CONCERNING ELECTRONIC COMMUNICATION DEVICE

31.     The fruits and instrumentalities of criminal activity are often concealed in digital form.  Furthermore, digital camera technology is often used to capture images of tools and instrumentalities of pending criminal activity.  The TARGET DEVICES have digital storage capacity and digital camera capabilities.

32.     Individuals engaged in drug trafficking offenses often use cell phones to communicate with suppliers, to place orders with suppliers, to communicate with customers, to receive orders from customers, and to arrange meeting times and locations for the distribution of controlled substances.  The individuals engaging in drug trafficking will often use a combination of voice calls and text messages to coordinate drug transactions.  Individuals engaged in drug trafficking offense also use digital storage devices to maintain telephone number "contact list" of individuals who may have assisted in the planning of this and other criminal activity.

33.     Narcotic traffickers often place nominal control and ownership of telephones in names other than their own to avoid detection of those telephones by government agencies.  Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

34.     Drug traffickers utilize different types of communication devices and change the numbers to these communication devices frequently.  This is done to avoid detection by law enforcement personnel.  Also, as noted above, drug traffickers dedicate different communication devices for different aspects of the trafficking organization.

35.     Cellular phones associated with drug traffickers include various types of evidence. Phones may contain relevant text messages or other electronic communications; they may contain electronic address books listing the phone numbers and other contact information associated with co-conspirators; and they may contain other types of information.

36.     Drug traffickers often take photos of themselves with large quantities of controlled substances, money, or high-end consumer items, like cars, watches, or firearms.  These "trophy" photos are often maintained on cellular telephones to be shared on social media, or as symbols of their success.

37.     Finally, the mere fact of a cellular phone's call number, electronic serial number or other identifying information may be of evidentiary value as it may confirm that a particular cell phone is the phone identified during a wiretap, pen register, or other electronic investigation.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

38.     Based on my knowledge, training, and experience, I know that electronic devices such as cellular phones (smartphones) can store information for long periods of time.  Similarly, things that have been viewed via the internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.  There is probable cause to believe that things that were once stored on the TARGET DEVICES may still be stored on the device, for various reasons, as discussed in the following paragraphs.

39.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that established how the TARGET DEVICES was used, the purpose of their used, who used them, and when.

40.     There is probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICES because date on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that had been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

41.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

42.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

43.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence

is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

44.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

45.     During this case and in numerous others involving complex DTOs, investigators have learned that the drug-trafficking organization relies heavily on electronic devices to facilitate drug trafficking. It is necessary to conduct a physical inspection of the TARGET DEVICES in order to obtain electronic communications and other information that might be stored on the TARGET DEVICES and to determine whether the TARGET DEVICES was the subject of wiretap, pen register or other investigation detailed herein. The TARGET DEVICES may also contain data and communications that were not electronically intercepted due to encryption or for other reasons.

46.     The TARGET DEVICES remains in the custody of law enforcement. The only known specifics of the TARGET DEVICES requested for authorization to search are detailed in Attachment A and the types of information expected to be recovered from the TARGET DEVICES are listed in Attachment B.

### <u>REQUEST FOR NIGHT-TIME AUTHORIZATION<br>AND DELAYED NOTIFICATION</u>

47.     There is good cause for the Court to authorize the requested search at any time of the day or night. The TARGET DEVICES are already in law enforcement custody, and it is reasonable to allow law enforcement to execute the requested search at any hour of the day, even

during the evening or night, if doing so is convenient for the investigators or examiners.  Because the TARGET DEVICES are already in law enforcement custody, there will be no prejudice to any other person from this request.

48.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice for 30 days from the date that the execution of the warrant is completed.  This delay is justified because there is reasonable cause to believe that providing immediate notification of the execution of this warrant may have an adverse result on this investigation, as defined in 18 U.S.C. § 2705.  In many cases due to advanced encryption technology and passwords used in modern cellular phones, a significant amount of time may elapse between when law enforcement begins to execute the warrant, and when the TARGET DEVICES can be searched or the evidence described in Attachment B can be recovered.    Providing immediate notice would seriously jeopardize the ongoing investigation, as such a disclosure would give persons an opportunity to destroy evidence (I am professionally aware that applications exist to remotely delete data from cellular devices, tablets, and computers), change patterns of behavior, notify confederates, which may cause the confederates to change their use of certain cellular devices or destroy evidence from their accounts identified through the execution of this warrant, and may afford them the opportunity to flee from prosecution.

## CONCLUSION

49.     Based upon the information set forth throughout this affidavit, I submit there is probable cause to believe that evidence will be found from an analysis of the recovered TARGET DEVICES.  The TARGET DEVICES may contain the records of the most recent calls, which may include calls with persons involved in the offenses(s).  The TARGET DEVICES may contain

copies of SMS or text or other electronic communications relating to activities associated with the offense(s). The TARGET DEVICES may contain a variety of other electronic evidence, including electronic communications through various cellular or internet-based applications, photographs, USPS tracking data, and other information.

50.     In consideration of the facts presented, I respectfully request this Court issue a search warrant for the TARGET DEVICES, and authorize the search of the items described in Attachment A, for the information set forth in Attachment B, where applicable, which constitute fruits, evidence, and instrumentalities of violations 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute Marijuana, Schedule I), 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance), and 21 U.S.C. § 843(b) (Transportation of Controlled Dangerous Substances via the United States Mail).

51.     I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

*Michael Pecukaitis*

Michael C. Pecukaitis, Postal Inspector
U.S. Postal Inspection Service

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____19_____ of April, 2021.

The Honorable Thomas M. DiGirolamo
United States Magistrate Judge

# ATTACHMENT A

## Items to be Searched

The following devices are to be searched, which are currently in the custody of the

United States Postal Inspection Service within the District of Maryland.

| TARGET DEVICE | DESCRIPTION & USPIS PEAP NUMBER |
|---|---|
| TARGET DEVICE 1 | Samsung Cellular Phone, Model No. SM-N975U, IMEI: 359186102966938, (USPIS PEAP # IS0001523529) |
| TARGET DEVICE 2 | Apple iPhone with IMEI: 356470101341886, (USPIS PEAP # IS0001523534) |

# ATTACHMENT B
## Items Subject to Seizure

1.     All records contained in the items described in Attachment A, which constitute evidence of violations of 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute Marijuana, Schedule I), 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance), and 21 U.S.C. § 843(b) (Transportation of Controlled Dangerous Substances via the United States Mail), as more fully described in the affidavit, and including:

   a.  Photographs of drugs, drug packaging/distribution paraphernalia, including, but not limited to photos of food saver-style bags, digital scales, grinders, packaging materials, and shipping labels;

   b.  Records that identify other co-conspirators;

   c.  Any and all digital images and videos of persons associated with this investigation as described in the affidavit;

   d.  Incoming and outgoing text messages or other messages;

   e.  Records of incoming and outgoing voice communications;

   f.  Voicemails or voice recordings that refer or related to the crimes under investigation;

   g.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   h.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   i.  Any and all records related to the location of the user(s) of the device;

   j.  Any and all of the above files which were deleted;

   k.  Any and all records related to the tracking of USPS parcels;

   l.  Any and all records related to travel to and from California; and

   m. For the TARGET DEVICES:

      i.  Evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

ii.   Evidence of software that would allow others to control the TARGET DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    i.   evidence of the lack of such malicious software;

    ii.   evidence of the attachment to the TARGET DEVICES of other storage devices or similar containers for electronic evidence;

    iii.   evidence of counter forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICES;

    iv.   evidence of the times the TARGET DEVICES was used;

    v.   passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICES;

    vi.   documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the TARGET DEVICES; and

    vii.   contextual information necessary to understand the evidence described in this attachment.

2.   With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

    a.   surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

     b.     "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

     c.     "scanning" storage areas to discover and possible recover recently deleted files;

     d.     "scanning" storage areas for deliberately hidden files; or

     e.     performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

3.     If after performing these procedures, the directories, files, or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file, or storage area, shall cease.

4.     With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.   If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.   The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.